**ROCKPORT YACHT & SUPPLY COMPANY, Inc., Libellant,**

v.

**The M/V CONTESSA, her engines, tackle, furniture, etc., Respondent.**

No. 280.

United States District Court
S. D. Texas,
Corpus Christi Division.

Oct. 8, 1962.

Ellis & Andrews (Wm. Ellis), Aransas Pass, Tex., for libellant.

Kleberg, Mobley, Lockett & Weil (R. W. Woolsey), Corpus Christi, Tex., for Claimant, American Marine Investments, Inc.

GARZA, District Judge.

Libellant, Rockport Yacht & Supply Company, Inc., seeks to execute alleged maritime liens against the M/V CONTESSA arising out of necessaries furnished to the vessel by Libellant and its assignors. After the libel was filed a warrant of seizure was issued and the vessel was seized by the marshal. Thereafter Claimant, American Marine Investments, Inc., holder of a preferred ship mortgage, made a claim to the vessel and filed a stipulation to abide decree.

It is admitted that at all times during which said necessary supplies were furnished to the CONTESSA the vessel was encumbered by one of several preferred mortgages, each of which contained a provision attempting to prohibit the creation of any lien other than for crews wages or salvage.

The owner of the CONTESSA, Murray Mobley, executed the first preferred mortgage in the series on February 28, 1958, to Cedar Island Oyster Company, Inc., in the amount of $14,000.00, after which the first of the supplies made the basis of the libel were furnished. On March 16, 1959, Mobley executed a preferred mortgage to American Marine Investments, Inc., in the amount of $22,385.00, which renews the above mortgage to Cedar Island Oyster Company, Inc., and which was assigned to C.I.T. Corporation on or about March 18, 1959. Thereafter additional supplies were furnished, and on September 29, 1959, C.I.T. Corporation satisfied the mortgage. The CON-

TESSA was conveyed by bill of sale from Mobley to Ralph Segura who then executed a preferred mortgage to American Marine Investments, Inc., on September 30, 1959, in the amount of $23,484.66. This mortgage was assigned to C.I.T. Corporation and thereafter additional supplies were furnished. The latter mortgage was satisfied on November 2, 1959, which satisfaction was filed on November 17, 1959, the same date that a new preferred mortgage was executed by Segura to American Marine in the amount of $23,484.66 and assigned to C. I.T. Corporation. The last supplies which were furnished to the vessel and out of which the libel arises, were delivered between February 7, 1960, and May 30, 1960.

The parties have stipulated that all supplies furnished by Libellant or its assignors were ordered by the owner or master of the CONTESSA, that all were necessaries, that the debts are fair and reasonable and are due, owing and unpaid, with the exception of the claims of Velasco Seafood Company, to which account no stipulation has been made.

Each of the mortgages encumbering the vessel contained the following provision:

> "Neither the owner, agent, master nor any charterer of the vessel has or shall have any right, power or authority to create, incur or permit to be placed or imposed on the vessel or any part thereof any lien whatsoever other than to the mortgagee or for crews wages or salvage."

■ The primary question to be determined is whether Libellant and its assignors acquired maritime liens upon furnishing necessaries to the vessel on the order of the owner or master, since all supplies were furnished at a time when the CONTESSA was encumbered by one of the preferred mortgages described above.

The effect of the above anti-lien provision must be interpreted in the light of Sections 971, 972 and 973 of the Federal Maritime Lien Act, which is codified as 46 U.S.C.A. §§ 971–975. The relevant sections are as follows:

> "§ 971. Persons entitled to lien
>
> "Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel. June 5, 1920, c. 250, § 30, Subsec. P, 41 Stat. 1005."

> "§ 972. Persons authorized to procure repairs, supplies, and necessaries
>
> "The following persons shall be presumed to have authority from the owner to procure repairs, supplies, towage, use of dry dock or marine railway, and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted. No person tortiously or unlawfully in possession or charge of a vessel shall have authority to bind the vessel. June 5, 1920, c. 250, § 30, Subsec. Q, 41 Stat. 1005."

> "§ 973. Notice to person furnishing repairs, supplies, and necessaries
>
> "The officers and agents of a vessel specified in section 972 of this title shall be taken to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel; *but nothing in this chapter shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor.*

June 5, 1920, c. 250, § 30, Subsec. R, 41 Stat. 1005." —(Emphasis supplied.)

Claimant relies on Section 973 and the anti-lien provision of the mortgage to prevent the creation of liens in favor of the suppliers. Libellant contends that maritime liens were created by the owner or master of the vessel in spite of the prohibitory covenant, and that Section 973 does not protect the mortgagee because it does not purport to deal with the authority of an owner or master to bind the vessel, but rather with that of a third person to represent the owner so as to create a lien.

It is the duty of inquiry imposed on a supplier by the latter part of Section 973 which creates difficulty, as it appears to be in conflict with the statutory presumption of authority in certain persons to create maritime liens conferred by Section 972.

■ Since we are not dealing with the terms of a charter party, or an agreement for sale of the vessel, the language "or for any other reason" in Section 973 must be taken to include a preferred mortgage in order to uphold Claimant's position; and, further, we must hold that a supplier has a duty of inquiry as to the authority of the owner or master to bind the vessel.

Historically, before the Ship Mortgage Act of 1920, a maritime lien for services to the ship took priority over a mortgage, even one containing an anti-lien provision. Gilmore & Black, Laws of Admiralty, Sec. 9–47. This was true after the passage of the Lien Act in 1910, which contained the duty of inquiry imposed by Section 973. Since the Ship Mortgage Act was not passed until 1920, this duty of inquiry obviously did not apply to a preferred ship mortgage, since there was no such thing at that time. The three quoted statutory provisions were re-enacted by the Ship Mortgage Act of 1920.

So we must now decide whether Section 973 should also be applied to a preferred mortgage containing an anti-lien provision. It does not appear that this point has been decided in the Fifth Circuit.

Most of the cases dealing with the effect of a covenant prohibiting the creation of liens arise out of charter parties and agreements of sale. The authorities in other Circuits, relating to preferred mortgages, support Libellant's position that the covenant does not prevent the creation of maritime liens, but merely subordinates them to the preferred mortgage, although there is dicta to the contrary.

The Bergen, 64 F.2d 877, 9 Cir., 1933, held:

"Likewise, in the instant case, we think 'the most' that the provision contained in the mortgage can do is to postpone the lien of libelant to that of the holder of the preferred mortgage.

"One who furnishes supplies to a vessel upon the order of the owner thereof is not required to examine the ship's papers or to make inquiry as to the authority of the owner to bind the vessel. Such authority is given him by statute as well as by virtue of his title. To be sure, one who furnishes supplies, etc., to the owner of a vessel is chargeable with notice of a valid preferred mortgage thereon; but, in our opinion, the language used in subsection R deals only with the authority of third persons to represent the owner, and not of the owner himself."

This holding is based on language by the Supreme Court in Morse Drydock & Repair Co. v. The Northern Star, 1926, 271 U.S. 552, 554, 46 S.Ct. 589, 70 L.Ed. 1082; which language had been held to be dictum by the district court because The Northern Star decision dealt with a mortgage which had not been perfected in accordance with the statute.

The question here is treated in an elaborate opinion by the District Court of Maryland wherein Judge Watkins traces the historical development of the statutes involved. Atlantic Steamer Sup-

ply Company v. The Tradewind, 144 F.Supp. 408, 1956 A.M.C. 1731, (D.Md., 1956). This case involves libels against a Liberian flag vessel arising out of supplies furnished by American suppliers while the ship was encumbered by a foreign preferred mortgage containing an anti-lien covenant; and its decision on the priority of the American maritime liens over a preferred mortgage involved deciding the exact question presented here, i. e., whether maritime liens could be created at all. The Court held (at p. 419) as follows:

> "Accordingly, this court holds that Section 973 was enacted and re-enacted as an exception in favor of the vessel owner and deals only with the authority of a third person to represent the owner so as to create a lien. It does not prevent the *creation of a lien* as such (the status of the lien being another matter) against the vessel by an owner in favor of a supplier irrespective of the prohibitory terms of any mortgage covenant made by the owner to the mortgagee."

This Court agrees with the logic and good sense of The Tradewind decision, and holds that Section 973 deals only with the authority of a third person to represent the owner so as to create a lien. The most that the provision contained in the mortgage can do is to subordinate the liens of Libellant to that of the holder of the preferred mortgage. In this way effect is given to all of the relevant statutory provisions, and the presumption of authority conferred by Section 972 of the Lien Act is not wiped out by the duty of inquiry imposed by Section 973.

The remaining two points to be considered relate to the priority of liens and to the effect of the stipulation to abide decree filed by the Claimant. Libellant urges that if maritime liens were created, it matters not whether they are preferred over the mortgage, as the stipulation makes no distinction between preferred and non-preferred liens. This contention must be upheld, and the argument of Claimant as to the intent of the mortgage holder cannot add language not contained in the stipulation itself. Therefore, it is not necessary to decide whether the sale of the vessel and execution of a new preferred mortgage effected a break in the priority of the original mortgage over the subsequent maritime liens. Having determined that Libellant and its assignors acquired valid maritime liens and that the stipulation secures all such liens, the question of priority becomes moot.

Libellant shall have judgment against Claimant for all claims except the Velasco claims. The Court will hear evidence on these on October 17, 1962, at 9:30 a. m. Clerk will notify counsel.